# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CALUMET CAPITAL PARTNERS LLC; CALUMET LIMITED LLC; and CALUMET PRINCIPALS LLC, individually and derivatively on behalf of CALUMET CAPITAL HOLDINGS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> VICTORY PARK CAPITAL ADVISORS, LLC; JANUS HENDERSON US (HOLDINGS) INC.; MRAH SPLITTER I, LP; VPC INVESTOR FUND B II, LLC; VPC INVESTOR FUND M, L.P.; VPC LEGAL FINANCE FUND HOLDINGS, L.P.; RICHARD LEVY; BRENDAN CARROLL; LUKE DARKOW; and CHAD CLAMAGE, <br><br> Defendants, <br><br> and <br><br> CALUMET CAPITAL HOLDINGS LLC, <br><br> Nominal Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 2025-0036-JTL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPINION REGARDING MOTION TO DISMISS

Date Submitted: December 2, 2025
Date Decided: January 29, 2026

Sidney S. Liebesman, Kasey H. DeSantis, FOX ROTHSCHILD LLP, Wilmington, Delaware; Howard Kaplan, Jed W. Glickstein, Matthew Underwood, David A. Schmutzer, Adam J. Smith, KAPLAN & GRADY LLC, Chicago, Illinois; Marc C. Smith, FOX ROTHSCHILD LLP, Chicago, Illinois; *Attorneys for Plaintiffs.*

Ryan D. Stottmann, Cassandra L. Baddorf, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Lazar P. Raynal, KING & SPALDING LLP, Chicago, Illinois; Kenneth Fowler, Prachee Sawant, Spencer Young, KING & SPALDING LLP, New York, New York; *Attorneys for Defendants*.

**LASTER, V.C.**

A litigation financier (the "Lender") specialized in loans to plaintiff-side law firms. The Lender agreed that in return for a $5 million investment, an alternative investment broker (the "Investor") would have preferential access to new loan opportunities for a two-year period. Under the agreement, the Lender had to present loans to the Investor's affiliated funds, and the funds had a right of first offer on funding them. The Lender would administer and service the funded loans, receive servicing fees, and benefit from a promote when the loans were repaid.

The business showed promise. The Lender presented and the Investor funded three loans with a total value of approximately $220 million.

According to the Lender, the business showed so much promise that the Investor wanted to take the business for itself. To that end, the Investor engaged in a systematic campaign to weaken the Lender while replicating the litigation finance business internally. The Investor's predatory actions included poaching the advisor the Lender was using to raise capital, subverting one of the Lender's principals, extracting the Lender's confidential information, interfering with the Lender's relationships with its law-firm borrowers, abusing the right of first offer, and ultimately hiring the Lender's subverted principal to run the replicated business.

With the Lender struggling to stay afloat, the Investor made a lowball offer to buy the business for $250,000. Minutes after the Lender rejected it, the Investor's affiliated funds designated the Lender's entire loan portfolio as non-performing. That designation prevented the Lender from receiving the servicing fees that funded its

operations. Contemporaneously, the Investor represented in other contexts that the loans were in good standing and would be fully repaid.

This action followed. The defendants moved to dismiss the complaint for failing to state claims on which relief could be granted.[1]

The claims addressed in this decision include breach of fiduciary duty by the Investor's representative on the Lender's board of managers, aiding and abetting breaches of fiduciary duty by the Investor, breach of a servicing agreement, and breach of the implied covenant of good faith and fair dealing inherent in an investment management agreement. Those claims can proceed past the pleading stage.

## I.      FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents it incorporates by reference.[2] At this procedural stage, the court must credit the complaint's well-pled allegations and draw all reasonable inferences in the plaintiffs' favor.

### A.      Calumet And The Investor

Plaintiffs Calumet Capital Partners LLC, Calumet Limited LLC, and Calumet Principals LLC are part of an investment firm that does business under the trade

---

[1] Two individual defendants moved to dismiss the complaint for lack of personal jurisdiction. The court granted their motion.

[2] Citations in the form "Compl. ¶ ___" refer to paragraphs of the amended complaint, which is the operative pleading. Dkt. 3. Citations in the form "Ex. ___ at ___" refer to exhibits to the complaint. Dkt. 5.

name "Calumet." Calumet specializes in providing loans to plaintiff-side law firms. Since its founding in 2018, Calumet has sourced, underwritten, and serviced nearly $1.2 billion in loans.

Daniel Carroll founded Calumet. Before the events giving rise to this litigation, Daniel[3] and Bill Mulvey were the firm's principals.

Defendant Victory Park Capital Advisors, LLC is the Investor. It is an alternative investment funder and manager that Richard Levy and Brendan Carroll co-founded.[4] Levy serves as its CEO, and Brendan is a senior partner.

In recent years, the Investor identified litigation finance as a profitable opportunity. Defendant Luke Darkow was the Investor employee responsible for its legal-credit business. In early 2021, Darkow began courting Calumet.

## B.     The Business Deal

By summer 2021, Calumet and the Investor had agreed on a deal to match Calumet's expertise in sourcing and servicing loans with the Investor's ability to access capital. The basic plan was for the Investor to invest $5 million in Calumet in return for the right to fund loans that Calumet originated for a period of two years (the "Investment Period").

---

[3] Because Calumet and Victory Park Capital Advisors each have a principal with the last name of Carroll, this decision refers to Daniel Carroll as "Daniel" and Brendan Carroll as "Brendan," without implying familiarity or intending disrespect.

[4] The complaint named both as defendants. In an oral ruling, the court granted their motion to dismiss for lack of personal jurisdiction.

3

To implement the business deal, Calumet agreed to form nominal defendant Calumet Capital Holdings LLC—the Lender—and conduct its business exclusively through that entity. The Lender has two members: Calumet Principals LLC (the "Calumet Member") and MRAH Splitter I, LP (the "Investor Member"). Calumet controls the Calumet Member. The Investor controls the Investor Member.

The Investor Member made a capital contribution of $5 million in exchange for a 10% member interest. The Calumet Member owned the balance of the member interest. The limited liability company agreement that governs the Lender (the "LLC Agreement") provided that if the Lender failed to raise $100 million in additional capital within the Investment Period, then the Investor Member's interest would increase from 10% to 20% for no additional consideration.

The LLC Agreement established a manager-managed governance structure.[5] A Board of Managers (the "Board") with three seats governed the Lender's business and affairs.[6] The Board could act at meetings by majority vote or without a meeting by unanimous written consent.[7] The Calumet Member had the right to fill two of the

---

[5] Ex. C § 5.1(a).

[6] *Id*. §§ 5.1(b), 5.2.

[7] *Id*. § 5.6.

Board seats and designated Daniel and Mulvey.[8] The Investor Member had the right to fill one of the Board seats (the "Investor Manager") and designated Darkow.[9]

The LLC Agreement designated Daniel and Mulvey as the Lender's officers.[10] Daniel was the Lender's CEO, President, and Treasurer. Mulvey was Secretary.

As vehicles to raise capital and fund the loans, the Investor created a series of investment funds, including VPC Investor Fund B II, LLC, VPC Investor Fund M, L.P., and VPC Legal Finance Fund Holdings, L.P. (the "Investor Funds"). Calumet Capital Partners LLC, the Investor, and the Investor Funds entered into an investment management agreement (the "Investment Agreement") that gave the Investor Funds a right of first offer during the Investment Period. Under its terms, the Lender had to present potential loans to the Investor Funds, which could decide whether to fund each loan in their sole discretion. The Investment Period would terminate early if the Investor's affiliates deployed up to $300 million in capital to fund loans.

Calumet Capital Partners LLC, Calumet Limited LLC, and the Investor Funds entered into a servicing agreement (the "Servicing Agreement") that made the Lender's affiliates responsible for servicing the loans and handling borrower relations. Under the Servicing Agreement, the Lender's affiliates received servicing

---

[8] *Id*. § 5.3.

[9] *Id.*

[10] *Id*. § 5.7.

5

fees from the loan payments made by law-firm borrowers.[11] But if the Investor Funds determined in their "reasonable credit judgment" that a credit facility was "non-performing," and if the Lender failed to cure the non-performance within sixty days, then the servicing fees would be suspended.[12]

## C.     A Promising Start

The business hit the ground running. Between February and September 2022, the Lender sourced loans to three plaintiffs' firms totaling approximately $220 million. The Investor funded them.

The Lender also took steps to raise $100 million in outside capital. In May 2022, the Lender retained Keel Harbour, a placement agent, to help with the capital raise. Daniel traveled with Keel Harbour to meet with institutional investors and family offices. While Daniel was traveling, Mulvey ran the Lender's business.

## D.     The Investor Maneuvers To Take The Business For Itself.

As summer turned to fall, the Investor became interested in taking the lending business for itself. To achieve that goal, the Investor engaged in a campaign to marginalize the Lender while replicating its capabilities internally.

### 1.     Putting Financial Pressure On The Lender's Principals

An early part of the Investor's plan involved weakening the Lender by restricting its principals' access to cash. The Lender received relatively modest

---

[11] Ex. D § 2(a)(i) & (b)(i).

[12] *Id.* §§ 1(v), 2(e).

6

compensation for servicing loans. The big payoff would come through the promote that the Lender would receive when loans were repaid.

In the near term, the Lender's principals had expenses that they needed to meet. The Investor took advantage of that fact by limiting Daniel and Mulvey's access to cash. Both had to make quarterly tax payments on the imputed interest income that the Lender constructively received on its share of the promote. The Lender's servicing fees were not sufficient to cover those obligations. The LLC Agreement called for the Lender to make tax distributions to cover the obligations, but the Investor refused to permit the Lender to make the distributions.[13]

The Lender also incurred expenses conducting its business. The Investor refused to reimburse the Lender for those expenses.

### 2. Misusing The Right Of First Offer

Another part of the Investor's plan involved misusing the Investor Funds' right of first offer.[14] When the Lender identified a loan, the Investment Agreement obligated the Lender to present it to the Investor Funds for a funding decision. If the

---

[13] The source of the blocking right is unclear, and the language on tax distributions appears mandatory. *See* Ex. C § 3.2(d). But the complaint alleges that the Investor could and did block the distributions.

[14] The complaint repeatedly refers to a right of first refusal. The Investment Agreement granted the Investor and the Investor Funds both a right of first refusal and a right of first offer, but they applied to different situations. *See* Ex. B §§ 2–3. The right of first refusal applied to third-party offers to refinance post-settlement loans. *Id.* § 3. The right of first offer applied to new loans. *Id.* § 2(d). The complaint's allegations address situations where only the right of first offer would apply. This decision therefore refers to the right of first offer, rather than the right of first refusal.

Investor Funds declined to fund, then the Lender could seek funding from other investors. By originating more loans, the Lender could generate more servicing fees to meet its obligations.

The Investor Funds used the right of first offer to consume the Lender's time and resources. When presented with loans, the Investor Funds consistently demanded more information. The Lender would indicate a willingness to fund, then drag out negotiations over the terms. Eventually, at the eleventh hour, the Investor Funds would reject the loan. In the meantime, the Lender had expended time and resources that it could have used to secure funding from another source.

The Lender contends that the Investor Funds did not reject the loans for valid business reasons but rather to weaken the Lender. On at least one occasion, the Investor Funds rejected the Lender's loan proposal, then secretly funded that loan themselves on similar terms.

### 3. Interfering With The Lender's Relationships With Borrowers

Another part of the Investor's plan involved going around the Lender to establish its own relationships with the law-firm borrowers. Even though the Investor was a non-operating member of the Lender, the Investor began communicating directly with the law-firm borrowers without the Lender's knowledge.

The Investor's direct communications had two consequences. First, they undermined the Lender's exclusive role as an administrative agent and servicer. Second, they enabled the Investor to establish the relationships necessary to take the business for itself.

### 4. Subverting, Then Poaching Mulvey

Yet another part of the Investor's plan was to recruit Mulvey. In late 2022, Darkow began encouraging Mulvey to leave the Lender and help the Investor establish Bespoke Capital, a competing litigation finance business. Mulvey eventually left the Lender, and he joined the Investor as a consultant the day after he resigned. Mulvey now serves as the managing director of Bespoke Capital.

Before his departure, Mulvey secretly helped the Investor. He shared the Lender's confidential information with Darkow and other Investor representatives, including information about employee compensation and equity distributions. Mulvey also helped the Investor develop Bespoke Capital. Mulvey took these actions while still one of Calumet's principals and its Chief Investment Officer and while serving as an officer of the Lender and as one of its managers.

### 5. Extracting A Discount

The Investor put more financial pressure on the Lender's principals in November 2022. The Lender's loans to law firms fell into two categories: (i) loans made before cases settled, which were riskier and generated higher rates of return, and (ii) loans made after cases settled, which were less risky and generated lower rates of return.

The Investor pushed the Lender to exit the post-settlement loan business and focus on pre-settlement loans. The Investor proposed to buy out the Lender's interest in the post-settlement loans it had already made.

Because of the Investor's actions, the Lender and its principals needed cash, and that made a buyout attractive. Taking advantage of the principals' financial distress, and using the confidential information that Mulvey provided, the Investor bargained to pay the Lender only $1.1 million for its share of a loan portfolio with a face value of approximately $1.65 million. After deducting $120,000 in account maintenance charges, the Lender received $980,000, or about 59 cents on the dollar for its share of the portfolio. The Lender used most of that sum to pay imputed taxes.

**6.    Poaching Keel Harbour**

Just as the Investor subverted and then poached Mulvey, the Investor did the same with Keel Harbour. The Lender had retained Keel Harbour to raise $100 million in capital. That money was important both for working capital and to provide a financial cushion for the Lender's principals. The LLC Agreement also provided that if the Lender did not raise $100 million within two years, then the Investor Member's equity interest would increase from 10% to 20% for no additional consideration.

In April 2023, the Investor induced Keel Harbour to abandon the Lender and work for Bespoke Capital. Without Keel Harbour's help, the Lender was unable to raise the capital it needed. Because the Lender failed to meet the $100 million threshold, the Investor Member's equity interest increased from 10% to 20% for no additional consideration. The Lender's financial distress deepened.

10

**E. The Loan-To-Own Proposal**

By fall 2023, the Lender desperately needed working capital to fund its operations. The Lender had expected to raise $100 million, but the Investor torpedoed that effort by poaching Keel Harbour.

On behalf of the Investor, Darkow proposed a loan secured by Calumet's equity interest in the Lender. That meant that if the Lender defaulted, the Investor could foreclose on Calumet's equity and end up owning 100% of the Lender. Darkow said that convincing the Investor to make the loan would be an "easy sell."

The Lender's principals engaged with the Investor and negotiated over the proposal. The Investor later reneged, leaving the Lender in an even worse position.

**F. The Investor Refuses To Consider Refinancing Proposals.**

With the relationship between the parties under strain, the Lender turned to other potential investors to refinance the business. The Lender secured proposals to refinance part of the loan portfolio on more favorable terms, repurchase the Investor's claim to a priority return, and buy back the Investor's equity stake.

The Investor refused to consider any proposal that did not also refinance the Lender's largest credit facility, a $135 million loan to a mass tort firm. According to the complaint, the Investor knew its demand was unrealistic. Because none of the proposals met that condition, the Investor refused to consider them.

**G. The Buyout Offer**

On June 21, 2024, the Investor offered to buy Calumet's 80% interest in the Lender for $250,000. That offer implicitly valued the business at no more than

$312,500, a far cry from the $50 million valuation implied by the Investor's purchase of a 10% stake for $5 million in 2021. At this procedural stage, the plaintiffs are entitled to the inference that the Investor starved the Lender for capital, interfered with its business, and made a predatory lowball offer.

The Lender rejected the bid. Minutes later, the Investor Funds sent a written notice designating all the Lender's credit agreements as "non-performing" (the "Non-Performing Designation"). The notice did not provide any reason for the Non-Performing Designation.

Under the Servicing Agreement, the Non-Performing Designation started a sixty-day cure period. If the Lender failed to cure, a suspension period would begin during which all servicing fees to the Lender would go to the Investor Funds instead. The Lender would lose its primary source of revenue. The suspension period would not end until the Investor Funds removed the Non-Performing Designation.

In later correspondence, the Investor's counsel claimed that the Non-Performing Designation was justified because the collateral securing each loan was materially impaired. The complaint supports a reasonable inference that that was not true.

For one credit facility, the Investor's counsel stated that the loan-to-value ratio exceeded 100% because the post-settlement collateral had materially underperformed. The complaint alleges that the loan was cross-collateralized and projected to be paid down well before the repayment date.

For a second facility, the Investor's counsel stated that a key attorney had left the law-firm borrower and asserted a claim to a material portion of the litigation portfolio securing the loan. The complaint alleges that the Lender had disclosed these developments to the Investor in 2023 and early 2024, and the Investor was not concerned.

For a third facility, the Investor's counsel stated that the law-firm borrower's collections had fallen short of expectations. The complaint alleges that the law-firm borrower continued to grow its collections and reported at least $22.9 million in additional collections since the Investor Funds' Non-Performing Designation.

Those allegations call into question the Non-Performing Designation. So do the Investor's contemporaneous representations in other contexts.

- In August 2024, the Investor certified to its auditor that all three loans remained unimpaired and valued at par as of June 30, 2024.

- In September 2024, the Investor reported to the IRS that all interest income from the loans was likely to be fully realized.

- During the same period, the Investor represented to prospective investors that the loan portfolio was worth 100 cents on the dollar.

- The Investor represented to a borrower that none of its loans were in default and all remained valued at par.

**H.    The Suspension Period Begins.**

The suspension period began on September 15, 2024. The complaint alleges that the Investor has taken control of the Lender and is running its business. The Investor has removed the Lender as the servicing agent and limited the Lender's access to financial information about the loans.

13

The complaint alleges that the Lender is teetering on the edge of insolvency. The Lender has lost hundreds of thousands of dollars in servicing fees, continued to carry millions of dollars in unreimbursed costs, and faced ongoing imputed tax liabilities.

## I.      This Litigation

In January 2025, Calumet filed this case on behalf of the Lender. In March, Calumet filed the operative complaint. The defendants moved to dismiss the complaint as failing to state a claim on which relief can be granted.

Count I asserts that the Investor Member, Darkow, and Chad Clamage breached the fiduciary duties they owed to the Lender by acting to harm the Lender and for the benefit of the Investor. The court previously dismissed the claim against the Investor Member and Clamage. Only the claim against Darkow remains.

Count II asserts that the Investor, Levy, and Brendan aided and abetted the Investor Member, Darkow, and Clamage in breaching the fiduciary duties they owed to the Lender. As noted, the court previously dismissed the breach of fiduciary duty claim against the Investor Member and Clamage. The court also previously dismissed Levy and Brendan from the case for lack of personal jurisdiction. Currently, Count II asserts only that the Investor aided and abetted Darkow in breaching his fiduciary duties.

Count III asserts a claim against the Investor Funds for breaching the Servicing Agreement by making the Non-Performing Designation without exercising "reasonable credit judgment."

Count IV asserts a claim against the Investor for breaching the implied covenant of good faith and fair dealing inherent in the Investment Agreement by exploiting its right of first offer to harm the Lender.

Count V asserts a claim for unjust enrichment against a third party that acquired the Investor. The court previously declined to dismiss this claim.

This decision addresses the remaining claims.

## II.     LEGAL ANALYSIS

A motion to dismiss under Rule 12(b)(6) tests whether the complaint's allegations state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[15] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[16] "Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[17]

---

[15] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[16] *Id.*

[17] *Id.* at 537 n.13.

The issues presented are whether the complaint adequately pleads that Darkow breached his fiduciary duties (Count I), that the Investor aided and abetted Darkow's fiduciary breach (Count II), that the Investor Funds breached the Servicing Agreement (Count III), and that the Investor breached the implied covenant of good faith and fair dealing (Count IV). Each claim survives.

## A.     Count I: The Claim For Breach Of Fiduciary Duty

Count I pleads that Darkow breached the fiduciary duties he owed as the Investor Manager by taking actions to harm the Lender and benefit the Investor. The defendants argue that the LLC Agreement contains broad language waiving all fiduciary duties, then substitutes a contractual obligation not to engage in fraud or willful misconduct. They say that because Count I pleads a claim for breach of fiduciary duty rather than a contractual claim for breach of the LLC Agreement, Count I must be dismissed. The defendants are incorrect, both in their interpretation of the LLC Agreement and as a pleading matter.

### 1.     The Poorly Drafted Protective Provision

The Delaware Limited Liability Company Act (the "LLC Act") authorizes an LLC agreement to override the fiduciary duties that a member, manager, or other person otherwise would owe by having those duties "expanded or restricted or eliminated."[18] The LLC Act also authorizes an LLC agreement to exculpate members,

---

[18] 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or

16

managers, and other persons from money damages by "provid[ing] for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties)."[19]

Duty modification and exculpation are different concepts. Duty modification affects whether an obligation exists. Exculpation affects the remedies that a party can seek. "Monetary liability may be out, but injunctive relief, a decree of specific performance, rescission, the imposition of a constructive trust, and a myriad of other non-liability-based remedies remain in play."[20]

The LLC Agreement contains a single poorly drafted provision that unhelpfully combines the concepts of duty modification and exculpation (the "Protective Provision"). In a single 125-word sentence, the Protective Provision states:

---

is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement . . . ."). Although the LLC Act technically permits parties to expand duties, drafters of entity agreements almost invariably use that authority to restrict or eliminate fiduciary duties. *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 193 & n.4 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE); *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *12 (Del. Ch. Oct. 7, 2019).

[19] 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.").

[20] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012).

To the extent that, at law or in equity, a Manager, an officer or any Member (individually, a "Covered Person") has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, such Covered Person shall have only the duties provided in this Agreement (and any other duties are expressly waived) and, except as otherwise specifically provided in this Agreement, shall not be liable to the Company or to any other Covered Person for its breach of fiduciary duty for such Covered Person's good faith reliance on the provisions of this Agreement or for breach of contract and breach of duties (including fiduciary duties), or for any approval or authorization granted by the Company or any other Covered Person.[21]

The first fifty-seven words of the Protective Provision address duty modification and strive to eliminate a Covered Person's fiduciary duties (the "Elimination Language"). The next sixty-eight words of the Protective Provision address exculpation by providing that a Covered Person "shall not be liable" except "as otherwise specifically provided in this Agreement" (the "Exculpation Language").

The Protective Provision does not end there. It continues with a fifty-eight word sentence that states:

The provisions of this Agreement, to the extent they eliminate or restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties to this Agreement to replace such other duties and liabilities of such Covered Person, other than an act or omission which constitutes fraud or willful misconduct.[22]

This sentence again attempts to address both duty modification ("to the extent [provisions of this Agreement] eliminate or restrict the duties") and exculpation ("to

---

[21] Ex. C § 5.10(a)(ii).

[22] *Id.*

the extent [provisions of this Agreement] eliminate or restrict . . . liabilities"). In each case, the Protective Provision limits the effect of the modification and exculpation by stating that the effect does not extend to "an act or omission which constitutes fraud or willful misconduct" (the "Preserving Language").

The parties join issue over how the Elimination Language interacts with the Preserving Language. Under one view, the Preserving Language creates an exception to the Elimination Language that allows existing law—including the law governing fiduciary duties—to continue to apply when the conduct involves fraud or willful misconduct (the "Fiduciary-Exception View"). Under this view, if a fiduciary duty or common law obligation would constrain a party's ability to engage in fraud or willful misconduct, then the Preserving Language allows that background law to continue to function. Under another view, the Elimination Language eliminates all non-contractual duties and liabilities, then the Preserving Language creates a contractual obligation not to engage in fraud or willful misconduct (the "Contract-Only View").

For pleading-stage analysis, the difference does not matter. In either case, if the complaint supports an inference that the defendant engaged in fraud or willful misconduct, then the litigation proceeds past the pleading stage. But the different approaches do matter for how the law operates. Under the Fiduciary-Exception View, common law tort law—legal or equitable[23]—continues to govern the elements of the

---

[23] "A claim for breach of fiduciary duty is an equitable tort." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840 (Del. Ch. 2022); *accord Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary

19

claim, the burden of proof, the standard of conduct, the standard of review, and the available remedies. Under the Contract-Only View, everything becomes a claim for breach of contract. Contract law governs the elements of a claim, the burden of proof, the standard of conduct, and the available remedies.

## 2. Notice Pleading Versus Claim Pleading

Under a notice-pleading regime, even if the Contract-Only View is correct, the fact that Calumet styled Count I as a breach of fiduciary duty claim would not be fatal. What counts is whether the complaint's allegations state a claim on which relief can be granted, not whether the complaint properly identified a specific cause of action. "Delaware has adopted the system of notice pleading that the Federal Rules of Civil Procedure ushered in, which rejected the antiquated doctrine of the 'theory of the pleadings'—*i.e.*, the requirement that a plaintiff must plead a particular legal theory."[24]

Under the theory of the pleadings, which was a feature of pleading at common law and of code pleading in some jurisdictions, a complaint had to "proceed upon some

duty is easy to conceive of as an equitable tort."); *see* Restatement (Second) of Torts § 874 cmt. b (A.L.I. 1979), Westlaw (database updated Sep. 2025) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[24] *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021) (TABLE).

definite theory, and on that theory the plaintiff must succeed, or not succeed at all."[25] If the facts did not support the theory that the plaintiff had picked at the outset of the case, then the court would not grant relief, even if the facts established an entitlement to relief under a different theory.[26]

Through a combination of rules, the Federal Rules of Civil Procedure "effectively abolished the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief."[27] The drafters of the Federal Rules consciously avoided references to pleading a "cause of action," a concept typical of prior pleading regimes.[28] Instead, the Federal Rules referred to a "claim" and required only "a short and plain statement of the claim showing that the pleader is entitled to relief."[29] Under the Federal Rules, "particular

---

[25] *Mescall v. Tully*, 91 Ind. 96, 99 (1883).

[26] *See* Fleming James, Jr., *The Objective and Function of the Complaint: Common Law—Codes—Federal Rules*, 14 Vand. L. Rev. 899, 910–11 (1961).

[27] 5 Charles Alan Wright, Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* § 1219 (4th ed.), Westlaw (database updated Sep. 2025) [hereinafter Wright & Miller] (footnote omitted).

[28] Stephen N. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective*, 135 U. Pa. L. Rev. 909, 976 & n.387 (1987).

[29] *See* Fed. R. Civ. P. 8(a)(2), 12(b)(6).

legal theories of counsel yield to the court's duty to grant the relief to which the

prevailing party is entitled, whether demanded or not."[30]

> [T]he federal rules—and the decisions construing them—evince a belief
> that when a party has a valid claim, he should recover on it regardless
> of his counsel's failure to perceive the true basis of the claim at the
> pleading stage, provided always that a late shift in the thrust of the case
> will not prejudice the other party in maintaining a defense upon the
> merits.[31]

Delaware adopted the Federal Rules and embraced their approach to pleading. "In

1948, the Courts of Delaware shook off the shackles of mediaeval scholasticism and

adopted Rules governing civil procedure modeled upon the Federal Rules of Civil

Procedure."[32] Court of Chancery Rule 8, which governs pleading, is based on the

federal model, and Rule 8(e) provides that "[p]leadings must be construed so as to do

---

[30] *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir. 1945) (Clark, J.).

[31] 5 Wright & Miller, *supra*, § 1219 (footnote omitted). *See generally Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11–12 (2014) (per curiam) (reversing dismissal of complaint for failure to articulate a claim under 42 U.S.C. § 1983; explaining that the Federal Rules of Civil Procedure reject the "theory of the pleadings" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

[32] Hon. Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 327 (1956) (internal quotation marks omitted).

justice."[33] The Delaware Supreme Court has consistently re-affirmed the principle of notice pleading.[34]

Under the notice-pleading regime, Calumet's decision to label Count I as a claim for breach of fiduciary duty in its complaint does not matter. The real question is whether the complaint contains a short, plain statement of facts sufficient to support a claim against Darkow for breaching the duties he owed as the Investor Manager.

### 3. The Complaint Pleads A Claim Under The Fiduciary-Exception View.

Under the Fiduciary-Exception View, the complaint pleads a claim for breach of fiduciary duty. Darkow was the Investor Manager until July 2024. In that role, Darkow owed traditional fiduciary duties of care and loyalty to the Lender, its members, and his fellow managers. The complaint's allegations support the inference that Darkow acted in bad faith, which is a species of willful misconduct falling within the Preserving Language.

The fiduciary principle requires that a corporate director or officer, or the manager or officer of an LLC, act prudently, loyally, and in good faith to maximize the value of the entity over the long-term for the benefit of the holders of its

---

[33] Ct. Ch. R. 8(e).

[34] *See In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 54 (Del. 2022); *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013); *Cent. Mortg.*, 27 A.3d at 536–37; *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

undifferentiated equity.[35] Delaware law presumes that a fiduciary has "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[36]

---

[35] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 680 (Del. Ch. 2023) ("The fiduciary principle requires that directors and officers act prudently, loyally, and in good faith to maximize the value of the corporation over the long-term for the benefit of the holders of its undifferentiated equity, who have presumptively committed their permanent capital to an entity with a presumptively permanent existence."); *see Hawkins v. Daniel*, 2021 WL 3732539, at *11 (Del. Ch. Aug. 24, 2021) ("The fiduciary principle generally requires that a fiduciary act loyally and in good faith to maximize the value of an asset held in a fiduciary capacity for the benefit of the *cestui que trust*."); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *20 (Del. Ch. Apr. 14, 2017) ("What the fiduciary principle requires in every scenario is that directors strive to maximize value for the benefit of the residual claimants.").

[36] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Brehm v. Eisner*, the Delaware Supreme Court overruled seven decisions, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See* 746 A.2d 244, 253 n.13 (Del. 2000) (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits the cases' cumbersome subsequent history, because stating that they were overruled by *Brehm* creates the misimpression that *Brehm* rejected a series of foundational Delaware decisions. More recently, the Delaware Supreme Court overruled *Aronson* and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), to the extent that they set out alternative tests for demand futility. *United Food & Com. Workers Union & Participating Food Indus. Emps.' Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). The high court adopted a single, unified test for demand futility. *Id.*

24

Delaware law "clearly permits a judicial assessment of [fiduciary] good faith."[37] Because good faith requires a singular subjective purpose, bad faith encompasses anything that causes a fiduciary's interests to diverge from that focus.[38] "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[39] "It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[40] Bad faith can be the result of "any human emotion

[37] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 53 (Del. 2006); *accord eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

[38] *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (bad faith encompasses both "an intent to harm [and] also intentional dereliction of duty"); *accord Disney II*, 906 A.2d at 64–66 (defining "subjective bad faith" as "conduct motivated by an actual intent to do harm," which "constitutes classic, quintessential bad faith," and "intentional dereliction of duty" as "a conscious disregard for one's responsibilities").

[39] *Disney II*, 906 A.2d at 67; *accord Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006) ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose *other than* a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[40] *In re Walt Disney Co. Deriv. Litig.* (*Disney I*), 907 A.2d 693, 754 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for

25

[that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[41]

---

monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.").

[41] *RJR Nabisco*, 1989 WL 7036, at *15; *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless."). The recent *Brola* decision argues against that understanding of fiduciary duty because it "lacks a limiting principle." *Brola v. Lundgren*, — A.3d — , —, 2025 WL 3439671, at *5 (Del. Ch. Dec. 1, 2025) (rejecting the syllogism "that because sexual harassment is selfish, and selfishness is disloyal, then harassment is a breach of the duty of loyalty" because "[t]hat logic lacks a limiting principle"). The lack of a limiting principle, however, is precisely the point. *See generally* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 633–34 (2010) ("Because the discretion that the DGCL affords directors is so wide, it is vitally important that directors exercise this discretion to advance the corporation's best interests and not for improper purposes. . . . [I]t has been traditional for the duty of loyalty to be articulated capaciously, in a manner that emphasizes not only the obligation of a loyal fiduciary to refrain from advantaging herself at the expense of the corporation but, just as importantly, to act affirmatively to further the corporation's best interests. In this respect, our law has been clear that the duty of loyalty is implicated by all director actions because all such actions must be undertaken in good faith to advance the corporation's best interests and because directors owe an affirmative obligation to put in a good faith effort to responsibly carry out their duties."). Loyalty's core demand requires that a fiduciary act in good faith, meaning that the fiduciary must believe subjectively that the action serves the best interests of the corporation. "Because every act of a director must be done for a proper, loyal purpose, every act in every context implicates the duty of loyalty." *Id.* at 639. If the fiduciary acts for subjectively selfish purposes or otherwise without believing that the conduct serves the best interests of the corporation, then there is a breach. Whether that breach is worth pursuing presents different issues than whether the claim exists. The same is true for the duty of care. *Id.* ("And because a loyal director must try to perform her acts with care, and because the law has embraced an enforceable duty of care, every act by a director implicates the duty of care.").

The complaint's allegations support a pleading-stage inference that Darkow acted disloyally to harm the Lender so that the Investor could take the business. The complaint alleges that Darkow subverted Mulvey, extracted confidential information from him, and convinced him to help the Investor develop Bespoke Capital. Mulvey subsequently left the Lender to run that competing business. Poaching Mulvey was a significant blow: Mulvey served as a manager and officer of the Lender, was one of its two principals, and managed the day-to-day business while Daniel was on the road trying to raise capital. Starting in late 2022, Darkow convinced Mulvey to help the Investor create a competing business with the expectation that Mulvey would get to run it. That promise induced Mulvey to share proprietary information that the Investor used to take advantage of the Lender.

More broadly, the complaint alleges that Darkow worked for the Investor. He was the Investor employee responsible for its legal-credit business. As the Investor's employee, he was the Investor's agent and owed fiduciary duties to the Investor.[42] He

_____

[42] An employee is an agent. Restatement (Third) of Agency § 7.07(3)(a) (A.L.I. 2006), Westlaw (database updated Oct. 2024) ("[A]n employee is an agent . . . ."); *see* Restatement (Second) of Agency § 2 (A.L.I. 1958), Westlaw (database updated Oct. 2024) ("A servant is an agent employed by a master . . . ."); Matthew T. Bodie, *Employment as Fiduciary Relationship*, 105 Geo. L.J. 819, 820 (2017) ("The hoary 'master–servant' doctrine holds that employees are agents of their employers and owe the traditional fiduciary duties of loyalty and performance."). An agent is a fiduciary. *Metro Storage*, 275 A.3d at 843; Restatement (Third) of Agency, *supra,* § 1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."); *id.* § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); *see Sci.*

*Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); Ramon Casadesus-Masanell & Daniel F. Spulber, *Trust and Incentives in Agency*, 15 S. Cal. Interdisc. L.J. 45, 68 (2005) ("While all agents are fiduciaries, not all fiduciaries are agents."); Thomas Earl Geu, *A Selective Overview of Agency, Good Faith and Delaware Entity Law*, 10 Del. L. Rev. 17, 20 (2008) (explaining that fiduciary status is "a result of agency" and collecting authorities establishing the point); Barak Orbach, *D&O Liability for Antitrust Violations*, 59 Santa Clara L. Rev. 527, 528 n.2 (2020) ("All agents are fiduciaries but not all fiduciaries are agents.").

There are Delaware cases that errantly assert that an agency relationship, standing alone, does not give rise to fiduciary duties on the part of the agent. *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *20 (Del. Ch. Mar. 5, 2014) ("Under Delaware law, the relationship of agent to principal does not itself give rise to fiduciary duties." (citing *Prestancia Mgmt. Gp., Inc. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *6 (Del. Ch. May 27, 2005)). That assertion can be traced to *Metro Ambulance, Inc. v. Eastern Medical Billing, Inc.*, where it originated. 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) ("The existence of a principal/agent relationship does not, in and of itself, give rise to a fiduciary relationship."). As the sole support for that assertion, the *Metro Ambulance* decision cited *Maull v. Stokes*, 68 A.2d 200 (Del. Ch. 1949), but the *Maull* decision did not say that not all agents are fiduciaries. The case involved a contractor who was hired to build a house and a garage. The contractor performed additional work not covered by the contract, and when he was not paid, he filed a mechanic's lien. The homeowner sued in the Court of Chancery for an accounting, and the question was whether equitable jurisdiction existed. The court held that there is "an implied relation of principal and agent between the owner of the property and a general contractor for the construction of a building thereon." *Id.* at 202. In the sentence that the *Metro Ambulance* court seems to have relied on, the *Maull* court stated that "[e]quity will not compel an agent to account to his principal merely because of the existence of that relation." *Id.* That sentence addresses the availability of an accounting. It does not suggest that some agents are not fiduciaries to their principals. To the contrary, the court exercised jurisdiction over the suit because (1) there was a fiduciary relationship and (2) the numerous details of the transactions meant that the matter could not be determined accurately or fairly by a jury in a court of law. *Id.* at 202–03. The assertion that some agents are not fiduciaries is not accurate and would cause Delaware law to conflict with settled doctrine.

therefore faced the dual-fiduciary problem identified in *Weinberger*, where the Delaware Supreme Court held that "[t]here is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."[43] If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict of interest.[44] But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest.[45] Darkow's interests as the Investor's agent, and his role in creating a litigation finance business for the Investor, created a direct conflict with

---

[43] *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983).

[44] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 186 (Del. Ch. 2014); *see, e.g.*, *Van de Walle v. Unimation, Inc.,* 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991).

[45] *Quadrant*, 102 A.3d at 186; *see Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors . . . were interested in the MEC transaction because they served on the boards . . . of both MOXY and FSC."); *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnote omitted) (internal quotation marks omitted)); *Rabkin v. Philip A. Hunt Corp.*, 498 A.2d 1099, 1106 (Del. 1985) (holding that parent corporation's directors on subsidiary board faced conflict of interest); *Weinberger*, 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent). *See also Rales*, 634 A.2d at 933 (explaining for purposes of demand futility that "'[d]irectorial interest exists whenever divided loyalties are present'" (quoting *Pogostin*, 480 A.2d at 624); *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, are both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the . . . [l]oan."); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336–37 (Del. Ch. 1987) (similar).

29

his duties as the Investor Manager and supports a pleading-stage inference that he acted willfully, disloyally, and in bad faith.

If Darkow's fiduciary duty of loyalty survived the Elimination Language in the LLC Agreement, the complaint adequately alleges that Darkow breached it.

### 4. The Complaint Pleads A Claim Under The Contract-Only View.

Under the Contract-Only View, the complaint again pleads a claim, but as a matter of contract law. The defendants contend that under the Contract-Only View, the breach of fiduciary duty claim that Count I technically pleads should be dismissed because the LLC Agreement eliminated fiduciary duties, but under a notice-pleading regime, it need not be.

An alternative entity agreement can eliminate fiduciary duties, then replace the eliminated duties with contractual obligations. In that setting, the resulting obligation is contractual, not fiduciary.[46] Even if the court imbues the contractual obligation with substantive content by looking to the content of a comparable fiduciary obligation, the obligation remains contractual.[47]

---

[46] *Tatum v. Fairstead Affordable LLC*, — A.3d —, —, 2025 WL 3011957, at *24 (Del. Ch. Oct. 27, 2025); *see El Paso Pipeline*, 113 A.3d at 194 ("A provision of a limited partnership agreement might turn on a particular state of mind, but the inclusion of requisite mental state for compliance with a provision is not the same as creating a fiduciary relationship or re-introducing fiduciary duties that have been eliminated."); *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *21 (Del. Ch. June 12, 2014) ("When an alternative entity agreement eliminates all fiduciary duties, then all fiduciary duties have been eliminated," even if "the alternative entity agreement might well include a contractual duty to disclose").

[47] *Tatum*, 2025 WL 3011957, at *24.

Under the Contract-Only View, the Elimination Language eliminates a Covered Person's "duties (including fiduciary duties)" and replaces them with "only the duties provided in this Agreement."[48] "[A]ny other duties are expressly waived."[49] After the Elimination Language wipes the slate clean, the Preserving Language creates a new contractual obligation not to engage in "fraud or willful misconduct."[50]

For pleading purposes, the question is whether the complaint states a claim for breach of contract based on Darkow's obligation not to engage in "fraud or willful misconduct." Under Delaware law, which governs the LLC Agreement, the elements of a claim for breach of contract are a contractual obligation, a breach of that obligation by the defendant, and a causally related injury warranting a remedy.[51]

No one disputes that the LLC Agreement is a valid contract. Under the Contract-Only View, the Preserving Language creates a contractual obligation not to engage in "fraud or willful misconduct." The LLC Agreement does not define "fraud," but fraud is a "knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment."[52] "Willful misconduct" is

---

[48] Ex. C § 5.10(a)(ii).

[49] *Id.*

[50] *Id.*

[51] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[52] *Fraud*, Black's Law Dictionary (12th ed. 2024).

31

"[m]isconduct committed voluntarily and intentionally."[53] "Willful" conduct is "not necessarily malicious."[54] "Misconduct" involves "unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust."[55] This court has interpreted "willful misconduct" as "intentional wrongdoing, not mere negligence, gross negligence or recklessness," but which involves either malicious conduct or "conduct designed to defraud or seek an unconscionable advantage."[56]

The terms "fraud" and "willful misconduct" in the LLC Agreement therefore impose a requirement that can only be breached if Darkow acted wrongfully and with scienter. "At the pleading stage, the trial court must draw reasonably conceivable inferences in favor of the plaintiff based on what the allegations of the complaint suggest, recognizing that it may be virtually impossible for a plaintiff to sufficiently and adequately describe the defendant's state of mind."[57] For pleading purposes, fraud or willful misconduct need only be reasonably conceivable.

The defendants argue that the complaint does not plead facts sufficient to support an inference that Darkow engaged in intentional wrongdoing, but a

---

[53] *Willful Misconduct*, Black's Law Dictionary, *supra*.

[54] *Willful*, Black's Law Dictionary, *supra*.

[55] *Misconduct*, Black's Law Dictionary, *supra*.

[56] *Dieckman v. Regency GP LP*, 2021 WL 537325, at \*36 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) (TABLE).

[57] *W.D.C. Hldgs., LLC v. IPI P'rs, LLC*, 2022 WL 2235005, at \*10 (Del. Ch. June 22, 2022) (internal quotation marks omitted).

defendant's state of mind "may be averred generally."[58] The degree to which a party must plead facts also takes into account whether "the facts lie more in the knowledge of the opposing party than of the pleading party."[59]

As this decision has explained, the complaint alleges facts supporting a reasonable inference that Darkow knowingly participated in the Investor's campaign to harm the Lender so the Investor could take the business. It is also reasonably conceivable that Darkow's breaches harmed the Lender. Under the Contract-Only View, the complaint states a claim.

### 5. Choosing Between The Two Readings

Whether the Fiduciary-Exception View or the Contract-Only View applies does not affect the pleading-stage outcome, but it will affect later stages of the case. Ruling on that issue now will assist in the simplification of the case and the formulation of issues for trial, which are important parts of a court's case management function.[60]

Although fiduciary duties may be disclaimed, drafters "must do so clearly," and they "should not be incentivized to obfuscate or surprise investors by ambiguously

[58] *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 158 (Del. Ch. 2003); *see* Ct. Ch. R. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

[59] *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 146 (Del. Ch. 2003).

[60] *See Goldstein v. Denner*, 310 A.3d 548, 569–70 (Del. Ch. Jan. 26, 2024) (discussing trial court's case management authority); *Sunder Energy, LLC v. Jackson*, 2023 WL 8868407, at *16 n.39 (Del. Ch. Dec. 22, 2023) (same); *Harris v. Harris*, 289 A.3d 310, 342–43 (Del. Ch. 2023) (same).

stripping away the protections investors would ordinarily receive."[61] Drafters of an LLC agreement "must make their intent to eliminate fiduciary duties plain and unambiguous."[62] The same is true of duty modification.[63] Under this principle, the interpretive scales tip in favor of preserving fiduciary duties, favoring the Fiduciary-Exception View.[64]

The existence of the Exculpation Language also favors the Fiduciary-Exception View. The Exculpation Language provides a Covered Person with limited exculpation from monetary liability "for its breach of fiduciary duty" if the Covered Person placed "good faith reliance on the provisions of this Agreement."[65] By carving out monetary liability for breaches of fiduciary duty, the Exculpation Language recognizes the continuing existence of fiduciary duties. If the Elimination Language truly eliminated

---

[61] *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sep. 4, 2014); *see Miller v. Am. Real Est. P'rs, L.P.*, 2001 WL 1045643, at *8 (Del. Ch. Sep. 6, 2001) ("A topic as important as [fiduciary duty waivers] should not be addressed coyly.").

[62] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009).

[63] *See Kelly v. Blum*, 2010 WL 629850, at *10 n.70 (Del. Ch. Feb. 24, 2010) ("Having been granted great contractual freedom by the LLC Act, drafters of and parties to an LLC agreement should be expected to provide parties and anyone interpreting the agreement with clear and unambiguous provisions when they desire to expand, restrict, or eliminate the operation of traditional fiduciary duties.").

[64] *Bay Ctr. Apartments*, 2009 WL 1124451, at *9; *see Miller*, 2001 WL 1045643, at *8 ("[D]efault principles of fiduciary duty will apply unless a partnership agreement plainly provides otherwise.").

[65] Ex. C § 5.10(a)(ii).

all fiduciary duties, then there would be no need for exculpation for those non-existent duties.

*Feeley*[66] reasoned similarly. There, the defendant argued on a motion to dismiss that an LLC agreement eliminated all fiduciary duties.[67] The court disagreed, noting that the LLC agreement contained exculpatory language recognizing the continuing existence of fiduciary duties.[68] The court reasoned that if the provision eliminated fiduciary duties, then it would be "counter-intuitive for the same provision to recognize exceptions to exculpation for gross negligence and willful misconduct."[69]

The Contract-Only View is therefore not a reasonable reading. The Fiduciary-Exception View controls. The motion to dismiss Count I is denied.

## B.    Count II: The Claim For Aiding And Abetting

The defendants next contend that the complaint fails to plead a claim for aiding and abetting the breach of fiduciary duty. Count II survives the defendants' motion to dismiss because the complaint's allegations support a reasonable inference that the Investor aided and abetted Darkow's fiduciary breach.

---

[66] *Feeley*, 62 A.3d 649.

[67] *Id*. at 663.

[68] *Id*. at 664.

[69] *Id*.; *see Bay Ctr. Apartments*, 2009 WL 1124451, at *9 (observing that "a contract should be read so as not to render any term meaningless" and finding that the defendants "have not offered a coherent argument for how the LLC Agreement can be read to eliminate fiduciary duties without rendering § 6.1(b) meaningless").

A claim for aiding and abetting has four elements: (1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) knowing participation in that breach, and (4) damages proximately caused by the breach.[70] "[A] claim for aiding and abetting often turns on meeting the 'knowing participation' element."[71] The "knowing participation" element "involves two concepts: knowledge and participation."[72]

The knowledge aspect requires that a plaintiff prove two types of knowledge.[73] First, the defendant must know that the primary defendant's conduct constitutes a breach.[74] Second, the defendant must know that its own participation in the conduct "was legally improper."[75] Knowledge of the primary violator's misconduct is not enough.

"Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability, the element of 'knowing participation' requires that the secondary actor

---

[70] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[71] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co.*, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017).

[72] *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021).

[73] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015).

[74] *Id.*; *accord Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.").

[75] *RBC Cap. Mkts.*, 129 A.3d at 862.

have provided 'substantial assistance' to the primary violator."[76] To assess substantial assistance, Delaware law applies a five-factor test derived from Section 876 of the *Restatement (Second) of Torts*. That framework calls for considering (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) his presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind.[77]

The defendants rely heavily on the Delaware Supreme Court's recent decisions in *Mindbody*[78] and *Columbia Pipeline*.[79] That is understandable, because both decisions made the knowing participation element more difficult to establish.

In *Columbia Pipeline*, the Delaware Supreme Court made the knowledge aspect tougher. Under prior law, constructive knowledge was enough.[80] In *Columbia Pipeline*, the justices held that the aider and abettor's knowledge "must be actual knowledge."[81]

---

[76] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015).

[77] *Id.* at *42; *see In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 395–96 (Del. 2024).

[78] *Mindbody*, 332 A.3d 349.

[79] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324 (Del. 2025).

[80] *RBC Cap. Mkts.*, 129 A.3d at 862 ("To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." (internal quotation marks omitted)).

[81] *Columbia Pipeline*, 342 A.3d at 368. The decision thus silently overruled *RBC Capital Markets* on this point.

In both *Mindbody* and *Columbia Pipeline,* the Delaware Supreme Court made

the "substantial assistance" test more stringent. *Mindbody* held that a failure to act

in the face of a contractual duty to act—there, an obligation to supply accurate

information and correct material misstatements and omissions in a proxy

statement[82]—did not constitute "substantial assistance" sufficient to support a

finding of knowing participation where the contractual counterparty knew about

material misstatements and omissions but remained silent.[83] The justices regarded

the inaction as an instance of "passive awareness" rather than an active failure to act

in the face of a known duty to act.[84] The justices followed the same reasoning in

---

[82] *See Mindbody*, 332 A.3d at 375 (describing contractual obligations); *id.* at 380 ("According to the trial court, Vista aided and abetted Stollmeyer's disclosure breach by failing to correct the Proxy Materials to include a full and fair description of its own interactions with Stollmeyer. In reaching this conclusion, the trial court relied on Vista's contractual obligation to review the Proxy Materials and notify Mindbody if there were any material omissions. The trial court found that Vista personnel reviewed the Proxy Materials, knew about Vista's interactions that were omitted and the significance of those omissions, and failed to speak up."); *id.* at 389 ("The trial court held that Vista's 'contractual obligation' in the merger agreement to review Mindbody's proxy statements and 'correct' any misstatements or omissions, and Vista's subsequent failure to correct omissions, amounted to 'knowing participation' in Stollmeyer's breach of his duty of disclosure.").

[83] *Id.* at 390 ("We hold that the Merger Agreement's contractual provision did not transform Vista's inaction into a 'knowing participation' in Stollmeyer's disclosure breach.").

[84] *Id.* at 393–94. *Mindbody* seems to have reasoned that the duty had to run to the injured party, rather than to the primary wrongdoer. The decision cited Section 876(c) of the *Restatement (Second) of Torts*, which provides that a third person is responsible for harm resulting from the tortious conduct of another where the person "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

*Columbia Pipeline*, where a parallel contractual duty existed, the counterparty knew about material misstatements and omissions, and the counterparty decided to remain silent.[85]

*Mindbody* and *Columbia Pipeline* were issued on appeal from post-trial decisions. They also involved third-party acquirers sued for aiding and abetting breaches of fiduciary duty by sell-side fiduciaries.

---

Restatement (Second) of Torts, *supra*, § 876(c), *quoted in Mindbody*, 332 A.3d at 394. Citing a Delaware Superior Court decision, *Mindbody* stated that "without a third party's independent duty to a plaintiff, there can be no liability for a failure to act." *Mindbody,* 332 A.3d at 394 (citing *Patton v. Simone*, 1992 WL 183064, at *9–11 (Del. Super. June 25, 1992)). The principal decision on which *Patton* relied did not rule on conscious inaction based on a duty to the primary wrongdoer. It stated only that conscious inaction would suffice for substantial assistance if the aider and abettor owed a duty to the plaintiff. *See Metge v. Baehler*, 762 F.2d 621, 624–25 (8th Cir. 1985) ("Although courts are by no means unanimous in treating the question of substantial assistance in a case of inaction, most seem to agree that, if the aider and abettor owes the plaintiff an independent duty to act or to disclose, inaction can be a proper basis for liability under the substantial assistance test."). To my eye, prior authorities had neither contemplated nor addressed the implications of an obligation owed to the primary wrongdoer, as opposed to a duty owed to the plaintiff. To my mind, if the alleged aider and abettor already owed a duty to the plaintiff, and the aider and abettor failed to act in the face of it, then the aider and abettor is a primary wrongdoer, and the aiding and abetting claim becomes superfluous. While I agree with the reasoning regarding the implications of inaction in the absence of any duty to act, it is not clear to me why the duty to act would need to run to the plaintiff to support an inference of knowing participation. As shown by my trial-level decision in *Columbia Pipeline*, I thought an intentional failure to act in the face of a known duty to act—including a duty owed to the primary wrongdoer—would be enough. *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 471 (Del. Ch. 2023) ("Where there is a duty to act, culpable participation can result from a conscious refusal to fulfill that duty."), *rev'd*, 342 A.3d 324 (Del. 2025).

[85] *Columbia Pipeline*, 342 A.3d at 368.

When a plaintiff alleges that a third-party acquirer knowingly participated in a breach of fiduciary duty by sell-side directors, Delaware law imposes an appropriately high pleading burden because an acquirer is expected to bargain in its own interest.[86] A plaintiff must plead meaningful facts to support an inference that the acquirer attempted to create or exploit conflicts of interest on the board or otherwise conspired with the directors to engage in a fiduciary breach.[87] Policy reasons also lead Delaware to impose a high pleading burden when a plaintiff alleges that a third-party advisor aided and abetted sell-side directors in breaching their duties.[88]

A case involving an affiliate of an allegedly culpable fiduciary presents a different situation.[89] The claim here is simply that the Investor carried out its scheme both with and through Darkow, its employee.

---

[86] *E.g.*, *In re Rouse Props., Inc., Fiduciary Litig.*, 2018 WL 1226015, at *25 (Del. Ch. Mar. 9, 2018) (explaining that the buyer was "entitled to negotiate the terms of the Merger with only its interests in mind; it was under no duty or obligation to negotiate terms that benefited [the seller] or otherwise to facilitate a superior transaction for [the seller]").

[87] *See Malpiede*, 780 A.2d at 1097–98; *In re Del Monte Foods Co. S'holders Litig.,* 25 A.3d 813, 837 (Del. Ch. 2011).

[88] *Singh v. Attenborough*, 137 A.3d 151, 152–53 (Del. 2016).

[89] *See, e.g.*, *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 818 (Del. Ch. 2022) (inferring at pleading stage that affiliate of interested controller who acted as financial advisor for transaction aided and abetted breach of duty by controller); *La. Mun. Police Emps.' Ret. Sys. v. Fertita*, 2009 WL 2263406, at *7 n.27 (Del. Ch. July 28, 2009) (inferring at pleading stage that affiliated entities that controller used to effectuate an interested transaction knowingly participated in the breach and were

40

At the pleading stage, a complaint must contain factual allegations supporting a reasonable inference that the aider and abettor had actual knowledge that the primary violator's conduct was a fiduciary breach, had actual knowledge that its own conduct was legally improper, and actively participated in the primary violator's misconduct. Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity."[90] For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge.[91] But "'[c]onclusory statements that are devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss.'"[92]

---

subject to viable claim for aiding and abetting); *see also Dole Food Co.*, 2015 WL 5052214, at *39 (holding after trial that affiliated entities that controller used to effectuate an unfair transaction knowingly participated in the breach of duty and were jointly and severally liable with controller for aiding and abetting the breach); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004) (same); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *15–16 (Del. Ch. Nov. 21, 1995) (Allen, C.) (denying a motion to dismiss aiding and abetting claims against controlling stockholder and his affiliates where the complaint alleged "overarching control" by the stockholder such that the court could "infer[] 'knowing' participation" by his affiliates).

[90] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014).

[91] *See id.*; *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *11 (Del. Ch. Jan. 18, 1996) (Allen, C.) ("[O]n the question of pleading knowledge, however, Rules 12(b)(6) and Rule 9(b) are very sympathetic to plaintiffs.").

[92] *Jacobs v. Meghji*, 2020 WL 5951410, at *7 (Del. Ch. Oct. 8, 2020) (quoting *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002)).

This decision has already held that Darkow owed fiduciary duties to the Lender and its members, that those fiduciary duties required that he not engage in fraud or willful misconduct, and that he inferably breached those obligations.

The complaint pleads sufficient facts to support the Investor's knowing participation in Darkow's acts. In fact, the aiding and abetting claim in this case is perhaps better understood as a claim for civil conspiracy. Between the two theories of secondary liability, "aiding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement."[93] Delaware cases have viewed aiding and abetting as the larger, more encompassing theory because it focuses on assistance, which may overlap with conspiratorial conduct or exist independent of it.[94] "In the fiduciary duty context, conspiracy is treated essentially as coterminous with aiding and abetting."[95] Consequently, "the confederation requirement includes 'knowing participation' in the conspiracy."[96]

The complaint supports an allegation of knowing participation in the sense of a conspiracy. Knowledge of Darkow's breach is imputed to the Investor because

---

[93] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt. L.P.*, 2011 WL 5314507, at *17 (Del. Super. Nov. 2, 2011), *aff'd*, 49 A.3d 1168 (Del. 2012).

[94] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 177 (Del. Ch. 2023).

[95] *OptimisCorp v. Waite*, 2015 WL 5147038, at *57 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016) (TABLE).

[96] *Id.*

Darkow is the Investor's agent and acted on its behalf. Working for the Investor and building up its litigation finance business was Darkow's principal job. It is easy to infer an agreement between Darkow and his employer to carry out the employer's scheme. As pled, Darkow engaged in disloyal conduct for the purpose of advancing the Investor's campaign to harm the Lender and take the business. That is inferably what the Investor wanted him to do, and he did it.

The participation prong is also satisfied. The complaint supports an inference that the Investor actively participated in and supported its employee's actions. The Investor was elbows deep in Darkow's efforts to subvert Mulvey, extract confidential information from him, and convince him to leave the Lender and run a competing business for the Investor. Darkow worked on the inside to set the Lender up for the Investor's punches, including its insistence on a discounted price for the post-settlement loan portfolio, the loan-to-own proposal, and the lowball buyout offer.

It is equally easy to infer that Darkow and the Investor's joint efforts harmed the Lender. The Investor used the Lender's confidential information to take advantage of the Lender in restructuring negotiations. The Investor suborned one of the Lender's two principals. The Investor has allegedly forced the Lender to the brink of insolvency.

Count II states a claim against the Investor for aiding and abetting Darkow's breaches of fiduciary duty.

## C. Count III: The Claim For Breach Of The Servicing Agreement

Calumet asserts in Count III that the Investor Funds breached the Servicing Agreement by making the Non-Performing Designation. The complaint adequately states a claim for breach of contract.

Delaware law governs the Servicing Agreement. Under Delaware law, the elements of a claim for breach of contract are "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[97]

No one disputes that the Servicing Agreement is a valid contract. Whether the complaint's allegations state a claim for relief presents an issue of contract interpretation.

Under Delaware law, "the role of a court is to effectuate the parties' intent."[98] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[99] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[100] "Contract language is

---

[97] *AB Stable*, 2020 WL 7024929, at *47.

[98] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[99] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[100] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

44

not ambiguous merely because the parties dispute what it means."[101] "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[102] "Delaware courts will not destroy or twist [contract] language under the guise of construing it."[103] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[104]

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[105] The Delaware Supreme Court has also instructed that "[t]he basic business relationship between parties must be understood to give sensible life to any contract."[106] A reasonable reading therefore must be "situated in the commercial context between the parties."[107] But this principle cannot be used to override the plain language of the

---

[101] *Id.*

[102] *Id.*; *see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[103] *Rhone-Poulenc*, 616 A.2d at 1195.

[104] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[105] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[106] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017).

[107] *Id.* at 926–27.

agreement. "While [Delaware courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[108]

The Servicing Agreement contemplates that the Investor Funds can declare a credit agreement to be non-performing. The Servicing Agreement does not actually create that right explicitly. It rather builds that right into the definition of "Non-Performing Credit Agreement," defined self-referentially as any credit agreement that the Investor Funds "have designated, in their reasonable credit judgment, as a material 'Non-Performing Credit Agreement' for all purposes of this Agreement."[109] The definition further states:

> For the avoidance of doubt, (i) any payment, bankruptcy or insolvency related default or event of default under a Credit Agreement, (ii) any material impairment of the collateral securing the obligations under any Credit Agreement, (iii) any material failure to make required deposits of cash collateral as required under any Credit Agreement or (iv) other material default or event of default under any Credit Agreement shall automatically deem such Credit Agreement a Non-Performing Credit Agreement hereunder.[110]

The Servicing Agreement later provides that "upon the date that is sixty (60) days after the first date of any designation of a Credit Agreement as a Non-Performing

---

[108] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge*, 166 A.3d at 926–27).

[109] Ex. D § 1(v).

[110] *Id.*

46

Credit Agreement hereunder . . . then all payments payable or distributable to Calumet Partners . . . in respect of such Non-Performing Credit Agreement shall be then paid and distributed to the [Investor Funds] . . . until such time as the [Investor Funds] remove the designation."[111]

The plain language of the Servicing Agreement thus requires that any non-performance designation fall within the Investor Funds' "reasonable credit judgment." The Servicing Agreement does not define that term. It does, however, provide a list of events "for the avoidance of doubt" that are sufficient to trigger a non-performance designation automatically.

Whether the complaint states a claim for breach turns on whether it is reasonably conceivable that the Non-Performing Designation fell outside the Investor Funds' reasonable credit judgment. "When a contract uses a term like 'reasonable' and 'reasonably,' the provision incorporates both a subjective and objective component."[112] "Subjectively, the party making the decision must have actually believed the justification proffered."[113] "Furthermore, the court must agree that an objective, reasonable person would view the justification as sufficient."[114] Applied to

---

[111] *Id.* § 2(e).

[112] *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1210 (Del. Ch. 2025).

[113] *Id.*

[114] *Id.* (citing *Allen v. Encore Energy P'rs L.P.*, 72 A.3d 93, 104, 107 (Del. 2013); *In re Riviera Res., Inc.*, 291 A.3d 1091, 1099, 1100 (Del. Ch. 2023)).

this case, the Investor Funds had to believe subjectively that their designation reflected reasonable credit judgment, and that belief had to be objectively reasonable.

The complaint alleges facts sufficient to support an inference that the Investor Funds made the Non-Performing Designation without exercising reasonable credit judgment. At the pleading stage, it is inferable that the Investor Funds did not subjectively believe their own designation. It is also inferable that the Investor Funds did not act reasonably.

### 1. Subjective Belief

A combination of factors supports a reasonable inference that the Investor Funds did not subjectively believe their own designation.

First, around the same time the Investor Funds made the designation, the Investor took positions in at least four other settings that were directionally inconsistent with the Non-Performing Designation. In those settings, the Investor represented to the IRS, its auditors, its investors, and a borrower that the Lender's loans were in good standing and fully performing.

The Investor argues the different representations involve different legal standards. That may be true, but the representations contradicted the notion that the loans were non-performing. Through the Non-Performing Designation, the Investor Funds took the position that the loans were non-performing. In those other settings, including important contexts like representations to a government agency and to its auditors, the Investor took the position that the loans were fully performing.

48

Those allegations support a pleading-stage inference that the Investor Funds did not believe their own Non-Performing Designation.

Second, the timing of the Non-Performing Designation is suspect. The Investor Funds sent the designation just minutes after the Lender declined the Investor's predatory offer to buy Calumet's 80% interest in the business for $250,000, or 5% of the valuation at which the Investor invested three years later. The notice of the Non-Performing Designation did not contain any reasons or justifications. The timing and the contents of the notice support an inference that it was a hardball tactic rather than a serious determination that the loans were non-performing.

Third, the complaint supports a pleading-stage inference that the Non-Performing Designation was part of the Investor's broader effort to weaken the Lender and enable the Investor to take the lending business for itself. Designating the entire loan portfolio as non-performing led to the suspension of the Lender's servicing fees. Although the Lender had the ability to cure the non-performance during the sixty-day period, the notice of the Non-Performing Designation did not identify any basis for the designation. There was thus nothing that the Lender could cure. It was not until later that the Investor's counsel proffered the post-hoc justifications that the Lender has questioned. By making the Non-Performing Designation and cutting off the Lender's primary revenue stream, the Investor Funds increased the financial pressure on the Lender. That action is consistent with the overall scheme alleged in the complaint.

Fourth, the Lender alleges that the Investor Funds ignored the Lender's requests for guidance on how to cure the non-performance. The Servicing Agreement contemplates that the Lender can cure the non-performance, which is not possible if the Lender has no idea what the basis for the non-performance designation might be. The Investor Funds failed to provide any reason for the Non-Performing Designation in its letter and ignored the Lender's requests. Although the Servicing Agreement does not expressly require the Investor Funds to provide a basis for the Non-Performing Designation or guidance on how to cure, the presence of a cure mechanism implies notification about the basis for the breach and an opportunity to cure. The Investor Funds' refusal to provide any contemporaneous explanation or assist the Lender supports the inference that the Investor Funds did not actually want any non-performance cured. The Investor Funds were supporting the Investor's scheme to pressure the Lender and take the business.[115]

Finally, the complaint's allegations call into question the after-the-fact justifications for the Non-Performing Designation. As detailed in the statement of facts, the complaint alleges that one credit facility was cross-collateralized and projected to be paid down before expiration, another borrower continued to grow its collateral pools and make payments, and a third involved risks that were disclosed

---

[115] The failure to provide notice of the grounds for non-performance and an opportunity to cure could well support a separate claim for breach of the implied covenant of good faith and fair dealing.

previously to the Investor and which the Investor discounted. These allegations support a pleading-stage inference that the post-hoc explanations were pretextual.

## 2. Objective Standard

The same factors that call into question the Investor Funds' subjective belief support an inference that the Non-Performing Designation was not objectively reasonable. The Investor Funds deemed the loans non-performing only minutes after the Lender rejected the Investor's buyout offer. Around the same time, the Investor indicated in at least four other settings that the loans were fully performing and in good standing. The Investor Funds did not provide a justification for the designation that the Lender could cure. The timing of the notice was inferably tactical, pretextual, and part of the Investor's systematic campaign to weaken the Lender and take the business. And according to the complaint, two credit facilities were performing well and the Investor had previously discounted the risks associated with the third credit facility. These allegations support a pleading-stage inference that the Investor Funds' delivery of the Non-Performing Designation was not objectively reasonable.

## 3. The Claim For Breach Of The Servicing Agreement

The defendants do not challenge whether the complaint adequately pleads the other two elements for breach of contract, *viz.* a contractual obligation and a causally related injury. The complaint adequately states a claim that the Investor Funds breached the Servicing Agreement.

51

**D.      Count IV: The Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

Count IV pleads that the Investor Funds breached the implied covenant of good faith and fair dealing inherent in the Investment Agreement.[116] During the Investment Period, the Lender had to provide the Investor Funds with "a right of first offer to invest in any additional investment vehicles" created for credit opportunities that the Lender identified.[117] The Investor Funds had "the right to fund . . . at their sole discretion, up to the entirety" of the investment, and subject to a maximum funding obligation of $200 million in the aggregate.[118] The complaint contends that the Investor Funds exploited their right of first offer to harm the Lender. It is reasonably conceivable that the Investor Funds breached the implied covenant. The motion to dismiss Count IV is denied.

---

[116] Calumet brings the implied covenant claim against the Investor, but the Investor Funds are the more appropriate defendants. The Investor and the Investor Funds are both parties to the Investment Agreement and possess rights under it. The right of first offer, however, belonged to the Investor Funds. Ex. B § 2(d). Under Delaware's notice-pleading regime, that type of technical misstep does not require dismissal. The Investor created the Investor Funds as vehicles to satisfy the Investor's obligations. The Investor controls the Investor Funds. Everyone on the defendants' side of the "v" is on notice of the claim.

[117] *Id.* The Investment Agreement granted the Investor and the Investor Funds three sets of rights during the Investment Period. One was the right of first offer. Another was a right to fund post-settlement loans. *Id.* § 2(a)–(c). Another was a right of first refusal on third-party offers to refinance post-settlement loans. *Id.* § 3. The other two rights are not at issue.

[118] *Id.* § 2(d).

## 1. The Legal Standard For An Implied Covenant Claim

As a matter of black-letter law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[119] Delaware law likewise recognizes that an implied covenant of good faith and fair dealing "attaches to every contract."[120] The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[121]

The Delaware Supreme Court has recognized that the implied covenant can apply in two different settings: (1) when a party invokes the covenant to imply an omitted right or obligation, and (2) when a party involves the covenant to constrain a counterparty's exercise of contractual discretion.[122]

---

[119] Restatement (Second) of Contracts § 205 (A.L.I. 1981), Westlaw (database updated Oct. 2024).

[120] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[121] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotation marks omitted).

[122] *See Johnson & Johnson v. Fortis Advisors LLC*, — A.3d —, —, 2026 WL 89452, at *16 (Del. Jan. 12, 2026) (explaining the "two primary ways" that the implied covenant operates).

### a. An Allegedly Omitted Term

One use of the implied covenant is to supply an omitted right or obligation. Initially, the court examines the contract to determine whether a gap exists that the implied covenant could fill. If so, then the court determines what omitted term should fill the gap. Only then does the court compare the allegedly wrongful conduct against the implied term to determine whether the covenant was breached.

### i. Identifying A Gap

When a party claims that a contract omits a right or obligation, the court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[123] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[124] The court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[125] "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than

---

[123] *El Paso Pipeline*, 113 A.3d at 183.

[124] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

[125] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[126]

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap."[127] "Not all gaps should be filled."[128]

One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used because doing so would grant a party what they "failed to secure . . . at the bargaining table."[129] A court must not use the implied covenant to "rewrite a contract" that a party "now believes to have been a bad deal."[130] "Parties have a right to enter into good and bad contracts, the law enforces both."[131]

But contractual gaps may exist for other reasons. In *Nemec*, the Delaware Supreme Court wrote that the implied covenant only applies to "developments that could not be anticipated, not developments that the parties simply failed to

---

[126] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

[127] *El Paso Pipeline*, 113 A.3d at 183.

[128] *Id.*

[129] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch.) (Strine, V.C.), *aff'd*, 861 A.2d 1251 (Del. 2004).

[130] *Nemec*, 991 A.2d at 1126.

[131] *Id.*

consider."[132] In *Johnson & Johnson*, the Delaware Supreme Court reaffirmed *Nemec*'s formulation, observing that "hindsight cannot correct oversight."[133]

Read literally, however, the "could not be anticipated" test would be impossible to overcome. Armed with enough time and resources, ample creativity, and sufficient luck, virtually any future state of the world *could be* anticipated. With the benefit of hindsight, the state of the world that actually arises will seem like a future that not only could, but should have been anticipated. Were "could not be anticipated" truly the law, the implied covenant would have no meaning.

*Johnson & Johnson* makes clear that the implied covenant remains meaningful. As the justices acknowledged in that decision, "no contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[134] That is because "[i]n only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive."[135] Put differently, parties do not have infinite resources, inexhaustible expertise, or unlimited creativity—even with access to AI. Consequently, even the most skilled and

---

[132] *Id.*

[133] *Johnson & Johnson*, 2026 WL 89452, at *17.

[134] *Id.* at *16.

[135] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

56

sophisticated parties will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect."[136] The implied covenant can reach those scenarios, even if they theoretically could have been anticipated by parties with sufficient resources, creativity, and luck.

The "could not be anticipated" test also cannot be literally true because the Delaware Supreme Court has recognized that "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[137] The justices have explained that "[t]he implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[138] Terms so obvious that both sides implicitly understood them are, necessarily, terms that could have been anticipated. Indeed, they were both anticipated and known, yet the implied covenant can address them because they were so basic that no one would have thought to include them in the agreement.

The "could not be anticipated" formulation thus stands as a salutary admonition against too readily identifying a contractual gap, but Delaware Supreme Court jurisprudence shows it cannot be strictly true. A court invoking the implied

---

[136] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010).

[137] *Dieckman*, 155 A.3d at 368 & n.26 (citing *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* (Kaufman Supp. 1984), § 570)).

[138] *Id*. at 361.

covenant must instead assess whether the parties realistically could have addressed the contingency. Making that assessment in turn requires resisting hindsight's seductive acuity, where knowledge of what actually happened makes the unforeseen seem readily foreseeable. When parties could not have realistically addressed a gap—either because of the circumstances they faced or their implicit understandings—then the implied covenant comes into play.

### ii. Supplying An Omitted Term

If an appropriate contractual gap exists, then the court must supply the omitted term. "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[139] The plaintiff therefore must show "from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[140] Put differently, the trial court must "analyze[] whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose."[141]

---

[139] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled on other grounds by Winshall*, 76 A.3d 808.

[140] *Katz*, 508 A.2d at 880.

[141] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1118 (Del. 2022).

## b. Discretionary Contract Rights

The second use of the implied covenant addresses situations "when a contract confers discretion on a party."[142] In that setting, the implied covenant requires the discretion-wielding party to "use good faith in making that determination."[143] "When the party exploits that discretion in a manner that defeats the 'overarching purpose' of the bargain, courts may imply a requirement that such discretion be exercised reasonably and in good faith to ensure that the discretionary power is applied consistently with what reasonable parties would have agreed to at signing."[144]

### i. Modifiers Do Not Displace The Implied Covenant.

As a threshold matter, terms that attempt to enhance the breadth of discretion, such as "sole discretion," do not displace the implied covenant.[145] When a party has sole discretion to make a decision, "[t]hat setting provides more reason for the implied covenant to apply, not less."[146]

---

[142] *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021).

[143] *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

[144] *Johnson & Johnson*, 2026 WL 89452, at *16.

[145] *See Cygnus Opportunity Fund, LLC v. Wash. Prime Gp., LLC*, 302 A.3d 430, 460 (Del. Ch. 2023).

[146] *In re P3 Health Gp. Hldgs., LLC*, 2022 WL 16548567, at *26 (Del. Ch. Oct. 31, 2022).

In *Wilmington Leasing*, limited partners could remove the general partner if they concluded that the general partner had not performed "satisfactorily."[147] The plaintiffs argued the implied covenant could not constrain their assessment of what was satisfactory. The court disagreed, reasoning that although the contract addressed removal, it did not address the scope of the limited partners' discretion.[148] Elaborating, the court noted that "[t]he disputed provision does not, for example, explicitly state that the limited partners' determination will be 'in their sole discretion.'"[149] *Wilmington Leasing* thus suggested that if a contract granted a party "sole discretion," that language could displace the implied covenant. That idea persisted in Delaware law for decades.[150]

---

[147] *Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, 1996 WL 560190, at *2 (Del. Ch. Sep. 25, 1996).

[148] *Id.*

[149] *Id.*

[150] *E.g.*, *Abex Inc. v. Koll Real Estate Gp., Inc.*, 1994 WL 728827, at *12 (Del. Ch. Dec. 22, 1994) (declining to apply the implied covenant because the contracts at issue "did not require Abex to consider Koll's idiosyncratic interests; on the contrary, they gave Abex the 'sole discretion' to settle"); *Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 & n.96 (Del. Ch. Aug. 16, 2012) ("When a contract provision states how a grant of discretion is to be exercised, there is no place for the implied covenant in that provision. Even in *Wilmington Leasing*, a case on which the Managing Partner relies heavily, the Court explained that it was implying obligations because the limited partnership agreement itself did not specify the scope of discretion." (footnote omitted)), *aff'd sub nom.*, *DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*, 75 A.3d 101 (Del. 2013); *Nemec*, 991 A.2d at 1132 n.44 (Jacobs, J., dissenting) (citing the *Wilmington Leasing* court's discussion of the term "sole discretion"). *See* Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware*

The Delaware Supreme Court set the record straight in *Miller*.[151] There, an operating agreement gave a board of managers "sole discretion" over a sales process.[152] The trial court found that the language "leaves no room for the implied covenant," citing *Wilmington Leasing*.[153] The Delaware Supreme Court disagreed, explaining that "the mere vesting of 'sole discretion' did not relieve the [holder] of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing."[154] The high court cited *Paige Capital*, where the trial court held that a provision granting a general partner "sole discretion" without "further flesh[ing] out what that term means . . . simply says that [the general partner] has

---

*Law*, 38 Del. J. Corp. L. 1, 23 (2013) ("The parties may agree that the discretion-exercising party enjoys unfettered, sole, and absolute discretion or, alternatively, limit the discretionary power with a reasonableness, good faith, or other like qualifier. Any such term would fill the gap in the contract by articulating the parties' bargained-for expectation." (footnotes omitted)).

[151] *Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018) (TABLE).

[152] *Miller v. HCP & Co.*, 2018 WL 656378, at *11 (Del. Ch. Feb. 1, 2018), *aff'd sub nom.*, *Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018) (TABLE).

[153] *Id.* at *11 & n.142.

[154] *Miller*, 194 A.3d at 908. *See CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *5 n.53 (Del. Ch. Oct. 1, 2012) ("A contract which grants one party sole discretion with respect to a material aspect of the agreement may, through the implied covenant of good faith and fair dealing, require that the exercise of discretion be in good faith."). The same is true for a contract that leaves a decision to a party's "absolute judgment." *Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 597 (Del. 1948). In that setting, the implied covenant requires "a judgment based upon sincerity, honesty, fair dealing and good faith, not one evidencing caprice or bad faith." *Id.*; *see Johnson & Johnson*, 2026 WL 89452, at *16 (discussing *Blish*).

61

the singular (i.e., sole) authority (i.e., discretion) to consider and decide this matter."[155]

Here, the Investment Agreement authorizes the Investor Funds to exercise the right of first offer in their sole discretion, and the Investor Funds rely on that language to defeat the implied covenant. Under *Miller*, that argument fails. The implied covenant still applies.

### ii. The Good Faith Exercise Of Discretion

Although the Delaware Supreme Court has made clear that the implied covenant applies to the exercise of a discretionary right, the Delaware Supreme Court has not provided substantial guidance regarding how to determine whether a party has wielded its discretion in "good faith" for purposes of the "fair dealing" that the implied covenant requires. The principles that govern the implied covenant teach that the exercise of discretionary authority must fall within the range of possibilities that the parties would have agreed to during their original negotiations, if they had thought to address the issue.

For starters, the concepts of "good faith" and "fair dealing" that appear in the implied covenant are contractual concepts, not fiduciary or tort concepts. When used with the implied covenant, the term "good faith" does not "envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of

---

[155] *Miller*, 194 A.3d at 908 n.5 (citing *Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355, at *32 (Del. Ch. Aug. 8, 2011)).

the parties' contract."[156] The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."[157]

When analyzing an implied covenant claim, a reviewing court does not introduce its own notions of what is "fair or reasonable under the circumstances."[158] The application of the "good faith" and "fair dealing" concepts turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally."[159]

This mode of reasoning differs significantly from how a court analyzes a fiduciary's good faith. In *Gerber*, the Delaware Supreme Court discussed the differences, stating:

> The temporal focus is critical. Under a fiduciary duty or tort analysis, a court examines the parties as situated at the time of the wrong. The court determines whether the defendant owed the plaintiff a duty, considers the defendant's obligations (if any) in light of that duty, and then evaluates whether the duty was breached. Temporally, each inquiry turns on the parties' relationship as it existed at the time of the wrong. The nature of the parties' relationship may turn on historical events, and past dealings necessarily will inform the court's analysis, but liability depends on the parties' relationship when the alleged breach occurred, not on the relationship as it existed in the past.

---

[156] *Gerber*, 67 A.3d at 419 (emphasis omitted).

[157] *Id.*

[158] *El Paso Pipeline*, 113 A.3d at 184.

[159] *Id.* (emphasis omitted) (internal quotation marks omitted).

> An implied covenant claim, by contrast, looks to the past. It is not a free-floating duty unattached to the underlying legal documents. It does not ask what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting.[160]

The retrospective focus applies equally to a party's discretionary rights. When exercising a discretionary right, a party to the contract must exercise its discretion reasonably. What is "arbitrary" or "unreasonable" depends on the parties' original contractual expectations, not a "free floating" duty applied at the time of the wrong.[161]

Without these types of limitations, a court's review of a party's exercise of a discretionary right would become what the Delaware Supreme Court has forbidden: a device for imposing judicial notions of fairness. The implied covenant prohibits arbitrary or unreasonable conduct that deprives the counterparty of the "fruits of the bargain."[162] It "does not establish a free-floating requirement that a party act in some morally commendable sense."[163] Nor is it "an equitable remedy for rebalancing

---

[160] *Gerber*, 67 A.3d at 418 (citing *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013)).

[161] *Id.* (quoting *ASB Allegiance*, 50 A.3d at 440–42).

[162] *Baldwin*, 283 A.3d at 1116.

[163] *El Paso Pipeline*, 113 A.3d at 182–83.

economic interests."[164] It "cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document."[165]

In essence, the discretionary right simplifies the traditional two-step inquiry because the court need not initially look for a gap. The discretionary right inherently creates the gap. The court therefore proceeds to the second step and asks, based on the contract and the parties' original bargaining position, how the parties would have filled the gap. As a result, the discretion must be exercised "consistently with what reasonable parties would have agreed to at signing."[166]

### iii.    A Prohibition On Using Discretionary Rights For The Sole Purpose Of Inflicting Harm

Delaware Supreme Court decisions indicate that a party violates the implied covenant if it exercises a discretionary contract right for the sole purpose of harming its counterparty. In *Baldwin,* the Delaware Supreme Court revived a line of authority under which a party can breach the implied covenant by acting in subjective bad faith. There, an operating agreement allowed an LLC to determine in its discretion whether a person met the standard of conduct for indemnification. A person who had been denied indemnification sued, alleging "a hostile and adverse relationship" in which

---

[164] *Nemec*, 991 A.2d at 1128.

[165] *Dunlap,* 878 A.2d at 441 (footnote omitted) (internal quotation marks omitted); *see Gerber,* 67 A.3d at 418 (the implied covenant "is not a free-floating duty unattached to the underlying legal documents").

[166] *Johnson & Johnson*, 2026 WL 89452, at *16.

the LLC terminated the plaintiff, determined that he was not entitled to indemnification, and engaged in litigation tactics intended to cause the plaintiff "to incur needless additional attorneys' fees and costs."[167] The trial court dismissed the complaint, but the high court reversed, holding that the complaint stated a claim for breach of the implied covenant because the discretionary right had to be exercised in good faith.[168]

In holding that the complaint sufficiently alleged that the defendants acted in bad faith, *Baldwin* treated the concept of bad faith under the implied covenant as synonymous with bad intent.[169] As support, *Baldwin* cited *Desert Equities*, a decision from 1993, where the Delaware Supreme Court referred to bad faith under the implied covenant as a "state of mind"[170] involving "the conscious doing of a wrong because of dishonest purpose or moral obliquity."[171] *Baldwin* also cited *Amirsaleh*, a decision from 2009, where this court stated a party could establish a breach of the implied covenant by showing that "the exercise of discretion was done in bad faith (i.e., that it was motivated by an improper purpose or done with a culpable mental

---

[167] *Baldwin*, 283 A.3d at 1122.

[168] *Id.* at 1119.

[169] *See id.* at 1118 nn.110 & 111 (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199 (Del. 1993), *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700 (Del. Ch. Nov. 9, 2009)).

[170] *Desert Equities*, 624 A.2d at 1208.

[171] *Id.* at 1208 n.16.

state)."[172] Relying on those precedents, *Baldwin* credited the plaintiff's allegation that the LLC was "trying to avoid indemnification" and had "taken every opportunity it could to try to avoid paying advancement."[173] The justices treated that allegation as "sufficient—albeit, barely so" to raise a litigable issue regarding scienter sufficient to state a claim for breach of the implied covenant.[174]

In reaching this conclusion, *Baldwin* did not discuss intervening authority that called into question *Desert Equities* and *Amirsaleh*. The implied covenant is a contract-law doctrine, and a breach of contract ordinarily does not turn on intent. True, drafters can craft a provision that turns on a counterparty's mental state,[175] but absent specific language, proving a breach of contract claim does not require scienter.[176] In other words, absent specific contractual language, "'[w]illful' breaches

---

[172] *Amirsaleh*, 2009 WL 3756700, at * 5.

[173] *Baldwin*, 283 A.3d at 1121.

[174] *Id.*

[175] *See, e.g., Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746–49 (Del. Ch. 2008) (interpreting merger agreement in which contractual limitation on liability did not apply to a "knowing and intentional breach").

[176] *See Hifn, Inc. v. Intel Corp.*, 2007 WL 1309376, at *13 (Del. Ch. May 2, 2007) ("[T]o the extent that [plaintiff] is contending that [defendant's] subjective motivations for wanting out of the contract give rise to an inference that it acted in bad faith, that argument fails under settled law."); *Myer Ventures, Inc. v. Barnak*, 1990 WL 172648, at *5 (Del. Ch. Nov. 2, 1990) ("[T]he contract does not require scienter for a breach to exist."); *Gilbert*, 490 A.2d at 1055 (holding that when party enforces conditions that "are expressed, the motivation of the invoking party is, in the absence of fraud, of little relevance").

have not been distinguished from other breaches."[177] This court therefore suggested in *ASB Allegiance* that *Desert Equities* and *Amirsaleh* represented a wrong turn for purposes of the implied covenant and mistakenly imported tort concepts into an area of contract law.[178] In 2013, the Delaware Supreme Court in *Gerber* endorsed and adopted *ASB Allegiance*'s "well-reasoned analysis as a correct statement of the law."[179] *Gerber* necessarily rejected the intent-based language from *Desert Equities* and *Amirsaleh*, implicitly overruling those decisions.

*Baldwin*, however, resurrected them. After *Baldwin*, bad intent can breach the implied covenant. But because parties can breach contracts intentionally, the intent-based version of the implied covenant must be limited. How then to apply it?

Consistent with other implied covenant cases, *Baldwin* stresses that the implied covenant should come into play when "the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[180] That framing seems to recognize that when parties enter

---

[177] Restatement (Second) of Contracts, *supra*, ch. 16 intro.; *see ASB Allegiance*, 50 A.3d at 442 ("A scienter requirement might seem to uproot the implied covenant from the land of contract and replant it in the realm of tort."); *NACCO Indus., Inc. v. Applica, Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) (noting Delaware's recognition of efficient breach, which permits a party to breach intentionally without incurring additional liability beyond the ordinary contract law remedies).

[178] *See ASB Allegiance*, 50 A.3d at 440–42.

[179] *Gerber*, 67 A.3d at 418.

[180] *Baldwin*, 283 A.3d at 1119 (quoting *Dieckman*, 155 A.3d at 367 (quoting *Nemec*, 991 A.2d at 1126)).

into a contract, they join together in a cooperative enterprise to create joint surplus—the proverbial fruits of the bargain.[181] As the *Restatement (Second) of Contracts* explains, parties commit themselves to advancing "an agreed common purpose."[182] While parties to a contract obviously are not fiduciaries and are free to act in their own interests, they have committed themselves to a joint effort.[183]

---

[181] *See Contrarian Funds L.L.C. v. Westpoint Int'l, Inc.*, C.A. No. 2617-CC, at 6 (Del. Ch. Nov. 3, 2010) (TRANSCRIPT) ("[C]ontracts are entered into for the benefit of all parties to the contract."), *aff'd*, 26 A.3d 213 (Del. 2011); *see also Northview Motors, Inc., v. Chrysler Motors Corp.*, 227 F.3d 78 (3d Cir. 2000) (alluding to the "mutual benefits created by legally binding agreements"); *Barbara v. MarineMax, Inc.*, 2013 WL 1952308, at *5 (E.D.N.Y. May 10, 2013) ("[C]ourts expect that parties will be guided by self-interest to enter into mutually beneficial contracts in the first place." (citing *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994))); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997) ("all contracting parties presumably contract for their mutual benefit").

[182] Restatement (Second) of Contracts, *supra*, § 205 cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."); *see* 1 Williston On Contracts § 1:1 (4th ed. 2008) ("Contract law is designed to protect the expectations of the contracting parties. It is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining. The goal of contract law is to hold parties to their agreements so that they receive the benefits of their bargains."); 17A Am. Jur. 2d Contracts § 362 (under the implied covenant of good faith and fair dealing, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). *See generally* Alan Schwartz & Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 Yale L.J. 541, 552–54 (2003) ("Bargaining power . . . is exercised in the division of the surplus . . . . Parties jointly choose the contract terms so as to maximize the surplus . . . .").

[183] *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1005 (Del. Ch. 2023); *see Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005) (alluding to the "wealth-creating and peace-inducing effects of civil contracts"), *aff'd in part, rev'd in part on other grounds*, 892 A.2d 1068 (Del. 2006). *See generally* Schwartz & Scott, *supra*, at 544 ("[C]ontract law should facilitate the efforts of contracting parties to

When looking to what parties would have agreed to when bargaining originally, a court must take into account that shared purpose. Given their agreed common purpose, a party in the original bargaining position would expect that the counterparty would not use a discretionary right to destroy the contractual relationship maliciously and without any justification rationally related to the shared contractual purpose. If one party to the negotiation suggested that it could use a discretionary right to destroy the contractual relationship on that basis, then the other side would reject the idea immediately.[184] "Absent an idiosyncratic taste for masochism, the rational response to the question, 'After we enter into this contract, can I intentionally seek to harm you?' is a resounding 'No.'"[185] That premise is so basic that asking for a commitment against malicious action would be unthinkable.[186]

Exercising a discretionary right maliciously and without a contractual justification goes beyond self-interested action that happens to inflict consequential or collateral harm. It thus transcends situations involving efficient breach. The

---

maximize the joint gains (the 'contractual surplus') from transactions."); Gerrit De Geest, *N Problems Require N Instruments*, 35 Int'l Rev. L. & Econ. 42, 46 (2013) ("[T]he fundamental goal of contract law [is] to maximize the joint surplus of the parties . . . ."); Jeffrey L. Harrison, *A Case for Loss Sharing*, 56 S. Cal. L. Rev. 573, 594 (1983) ("Partnership law and contract law are both designed to foster the sharing of a jointly created surplus.").

[184] *ArchKey*, 302 A.3d at 1005.

[185] *Id.*

[186] *Id.*

general rule remains: A party has wide discretion within which to wield a discretionary right consistent with the parties' understandings from their original bargaining positions. A party obviously can wield a discretionary right to promote contractual goals and create joint surplus. Just as obviously, a party can wield a discretionary contractual right to protect its own interests. A party with a good faith basis for its determination cannot be held liable for the intent-based version of the implied covenant.[187] But a party cannot wield a discretionary contractual right like a mafia gangster by using it to inflict harm on the counterparty unless the counterparty does what it wants.[188]

---

[187] *See New Wood Res. LLC v. Baldwin*, 2023 WL 4883924, at \*9 (Del. Super. July 31, 2023) ("While one could argue negligence from these facts, or that ACR was just plain wrong in its assessment, no reasonable jury could find bad faith from them. Further, no other facts exist in this record to show, for instance, that Mr. Bursky harbored any personal animus or intentionally sought to harm Dr. Baldwin, when he executed the Written Consent as President of ACR."), *aff'd,* 315 A.3d 445 (Del. 2024).

[188] As an example, take a buyer that has a discretionary right to make adjustments to a closing balance sheet when the entries on the balance sheet are not consistent with GAAP. The buyer can wield that right to modify entries where the buyer has a good faith basis to claim GAAP non-compliance. The buyer cannot make adjustments that are so extreme and unjustified as to indicate malice. In the latter setting, the party with the discretionary right lacks any justification rationally related to the purposes of the contractual relationship. *ArchKey*, 302 A.3d at 1001. Or consider an equity investor with a veto right over future financings. The investor could wield that right to block any financing that the investor rationally believed would harm the entity, unfairly dilute its interest, or unduly favor the counterparty or another party. But an investor could not veto any financing on offer, even if favorable, as part of a threat to force bankruptcy unless the entity bought out the investor. That type of conduct goes beyond even the mafia gangster by emulating the suicide bomber. Terroristic threats against the joint contractual enterprise violate the implied covenant.

71

### iv. Applying A Subjective Test

The intent-based version of the implied covenant necessarily incorporates a subjective test. But "currently available technology does not make an individual's mental state directly observable."[189] "That is true for all humans, including judges."[190]

"Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications."[191] "To get at a person's unobservable mental state, we look at what the person did and the circumstances in which they did it."[192] "Objective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief."[193] For purposes of the intent-based version of the implied covenant, a plaintiff must plead and later prove that the defendant acted maliciously and without a justification rationally grounded in the contractual relationship.

---

[189] *Id.*

[190] *Id.*

[191] *El Paso Pipeline*, 113 A.3d at 178.

[192] *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1164 (Del. Ch. 2024).

[193] *El Paso Pipeline*, 113 A.3d at 178.

**2.    The Claim For Breach Of The Implied Covenant In The Investment Agreement**

It is reasonably conceivable that the Investor Funds exercised their right of first offer maliciously and without a justification rationally grounded in the contractual relationship. Doing so violates the implied covenant.

The Investor Funds possessed a discretionary right: the right of first offer on loan opportunities the Lender generated. The Investor Funds could decide whether to fund those opportunities in their sole discretion for a wide range of contractually grounded purposes. If the Investor Funds thought a particular loan was economically unattractive, excessively risky, poorly underwritten, or otherwise harmful to their own interests or the venture's, then the Investor Funds could decline to fund it. No liability under the implied covenant could result from such a decision.

The Investor Funds could also use their right of first offer to create joint surplus for the Investor and Lender. If, for example, the Investor Funds believed that funding plaintiff-side firms pursuing antitrust claims would be particularly valuable to the business, while funding other types of loans would not, then the Investor Funds could exercise their right of first offer on that basis and only fund antitrust-related loans.

What the Investor Funds could not do was use their right of first offer for the sole purpose of inflicting harm on the Lender without any contractually grounded justification. The complaint alleges that the Investor Funds misused their right of first offer by turning it into a weapon to exhaust the Lender's time and resources. The complaint alleges that the Investor Funds would indicate that they intended to fund,

73

request additional information and due diligence, string out negotiations, and then decline to fund at the last minute. Critically, the complaint alleges that in one instance, the Investor Funds rejected a loan and then secretly funded it on their own. The last incident is crucial because it supports an inference that the Investor Funds were not exercising their right for the legitimate purpose of evaluating loans and ultimately declining to fund, but rather to harm the Lender.

The implied covenant theory also finds support in the complaint's allegations about the Investor's broader efforts to harm the Lender. Those efforts amounted to a systematic campaign to weaken the Lender so that the Investor could eventually take the business for itself. Against that backdrop, the complaint's allegations support the inference that the Investor Funds wielded their right of first offer in breach of the implied covenant.

### III.  CONCLUSION

The motion to dismiss is denied as to the points addressed in this decision. This case may proceed past the pleading stage.